UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER EMMET,

          Plaintiff,

                                 Case No.: 16-cv-11211

v.                              Honorable Gershwin A. Drain

TOM DEL FRANCO, *et al.,*

          Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT [#40] AND AMENDING SCHEDULING ORDER

## I.      INTRODUCTION

On August 18, 2016, this Court entered an Order Denying the Defendants' Motion to Dismiss without prejudice. The Court's Order permitted the Plaintiff to file an Amended Complaint. Plaintiff filed his Amended Complaint on September 1, 2016.

Presently before the Court is the Defendants' Motion to Dismiss the Amended Complaint, filed on September 15, 2016. Plaintiff filed a Response in Opposition on September 29, 2016, and Defendants filed a Reply in Support of their Motion to Dismiss on October 13, 2016. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition

of this matter.   Accordingly, the Court will decide the instant motion on the submitted briefs.   *See* E.D. Mich. L.R. 7.1(f)(2).   For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion to Dismiss the Amended Complaint.

## II.   FACTUAL BACKGROUND

Plaintiff Peter Emmet and Defendant Nicholas Del Franco were acquaintances.   In early July of 2013, Nicholas contacted Plaintiff by phone and advised Plaintiff that he had purchased a farm in Amherst, Massachusetts. Nicholas claimed that the Amherst Farm was owned and operated as part of the Organic America Collective.   After Plaintiff had a chance to visit the farm, Nicholas suggested that Plaintiff invest in Amherst Farm and Nicholas's other businesses.   Nicholas claimed the Amherst Farm would become a massive self-sustaining and renewable aquaponics/hydroponic farm.   In August of 2013, Nicholas made a promotional video about Amherst Farm and the scope of operations that would occur there, including rooftop greenhouses, in tank fish farming, and the use of fish waste as a fertilizer.

In August of 2013, Nicholas convinced Plaintiff to buy into all of Nicholas's operations and become a part owner.   Specifically, Nicholas represented to Plaintiff that he would be purchasing an eight percent (8%) interest in the Organic

America Collective,[1] which he claimed consisted of a number of different businesses and operations. Specifically, the Organic America Collective included: (a) Amherst Farm, (b) an entity that was selling growing lights and supplies in Michigan, (c) an entity that was an organic food store and farm in Florida, and (d) a State approved marijuana growing warehouse located in Michigan. Also, in August of 2013, Nicholas met with Plaintiff, Plaintiff's mother and her boyfriend on multiple occasions. During these meetings, Nicholas represented that Organic America Collective was a collection of viable operations and claimed that investment in the Collective would be safe and profitable.

Also, in August of 2013, Nicholas introduced Plaintiff, his mother and her boyfriend to Defendant Martin Karo, who is an attorney and another principal, owner, manager, and/or shareholder of some or all of the Defendant corporations. Nicholas advised Plaintiff that Karo would be his attorney and "look out" for Plaintiff. Karo prepared several versions of loan documents for Plaintiff to present to his mother in an effort to secure a loan. By virtue of Karo drafting the Promissory Note, Plaintiff believed an attorney-client relationship was formed in which Karo was Plaintiff's attorney. Karo never advised Plaintiff of any conflict of interest that existed by holding himself out as counsel for Plaintiff.

Neither Karo nor Nicholas advised Plaintiff, his mother or her boyfriend of

---

[1] The "Organic America Collective" is a departure from the original Complaint, which confined its allegations to the written agreements between Plaintiff and Greenhouse Leasing.

any risks associated with investing in the Organic America Collective.  Nor did they disclose any debt or other obligation that Organic America Collective had to any third party at the time they solicited the investment.  Based upon the representations that investing in the Organic America Collective would be safe and very lucrative, Plaintiff's mother agreed to loan money to Plaintiff so he could invest in the Organic America Collective.  The loan was secured by a mortgage against Plaintiff's primary residence in the amount of $600,000.00.

On August 6, 2013, Nicholas, on behalf of Organic America Markets, LLC ("OA"), entered into a written agreement with Plaintiff entitled "Organic America/Emmet Joint Venture Agreement ("JV Agreement")."  The JV Agreement states in relevant part that: "The intent is for the parties to ultimately be 50/50 owners of Hydroponics House LLC, d/b/a Organic America of Detroit, which shall be the retail outlet of Organic America in the Detroit area."   Pursuant to the JV Agreement, the profits generated by Hydroponics House, LLC, d/b/a Organic America of Detroit were to be split 50/50 between Plaintiff and Organic America Markets, LLC.  Karo and Nicholas both represented to Plaintiff that the JV Agreement documented Plaintiff's eight percent (8%) interest in the Organic America Collective.

The JV Agreement stated that upon receipt of Plaintiff's funds, Organic America Markets, LLC would then construct an herbal remedy dispensary at a

location to be determined. The JV Agreement stated that Organic America Markets, LLC was responsible for setting up an herbal remedy dispensary by: (a) setting up the operating LLCs for the herbal remedy dispensary, (b) finding and leasing the appropriate facilities, (c) obtaining equipment, (d) hiring personnel, (e) funding operating expenses, (f) arranging security, (g) arranging for insurance, and (h) overseeing the operations and handling marketing.

On or about October 1, 2013, at the direction of Karo and Nicholas, Plaintiff caused the disbursement of approximately $500,000.00 to Defendant Greenhouse Leasing Company, LLC via electronic wire transfer for what Plaintiff believed satisfied his financial obligations under the JV Agreement. Plaintiff intended the funds to serve as his purchase of a fifty percent (50%) ownership interest in Hydroponics House LLC, d/b/a Organic America Detroit and his eight percent (8%) interest in Organic America Collective. Plaintiff claims that the "Individual Defendants and/or Corporate Defendants have failed to engage in the required steps set forth in the JV Agreement[,]" failed to compensate him and rebuffed his repeated requests for an accounting. Karo has since disclosed that the funds solicited from Plaintiff pursuant to the JV Agreement were funneled to various bank accounts, and ultimately were deposited into Nicholas's personal bank account.

Also, on or about August 6, 2013, Plaintiff and Nicholas, on behalf of

Defendant Greenhouse Leasing Company, LLC, entered into a written agreement entitled "Greenhouse Construction and Operation Agreement." Plaintiff believed that he was likewise represented by Karo in connection with this agreement. The Greenhouse Agreement stated that the parties would be 50/50 owners of an LLC, which shall set up and operate a greenhouse/sheltered growth facility. While Plaintiff alleges that the Greenhouse Agreement required payment from him in exchange for his ownership interest in Greenhouse Leasing Company, LLC, the actual agreement is silent as to the amount of payment required of the Plaintiff.

Plaintiff alleges that on or about August 8, 2013, at the direction of Karo and Nicholas, he disbursed approximately $122,000.000 via electronic wire transfer to Defendant Greenhouse Leasing Company to satisfy his requirements under the Greenhouse Agreement and to purchase an interest in the Organic America Collective. Under the Greenhouse Agreement, fifty percent of the profits generated by the growth facility were to be paid to Plaintiff. Karo and Nicholas likewise advised Plaintiff that the Greenhouse Leasing Agreement memorialized his eight percent (8%) interest in the Organic America Collective.

Plaintiff has repeatedly requested stock certificates demonstrating his ownership interest in the company, however none of the Defendants have responded to his requests. Nor has Plaintiff been paid any profits or provided with an accounting of the monies he invested in exchange for his ownership interest.

Karo has since disclosed that the funds solicited from Plaintiff pursuant to the Greenhouse Agreement were funneled to various bank accounts, and ultimately were deposited into Nicholas's personal bank account.

Following Plaintiff's investment into the Organic America Collective, Karo and Nicholas advised Plaintiff that he was expected to work at the Amherst Farm. Defendants Tom DelFranco and John Ostendorf were managers at the Amherst Farm, as well as principals, owners, managers and/or shareholders of some or all of the Defendant corporations. Tom DelFranco is Nicholas's father. Plaintiff claims that Tom DelFranco and Ostendorf worked collectively with Nicholas and Karo to create the perception to Plaintiff that he held an ownership interest in the Organic America Collective, which was a collection of viable businesses.

In October of 2013, Nicholas ordered Plaintiff to trade in his Chevy Suburban valued at $23,000.00 towards the purchase of a Ford F-350 Ford pickup truck, which was to be used in connection with Plaintiff's work at Amherst Farm. Plaintiff alleges that Karo and Nicholas required Plaintiff to purchase the vehicle in the name of Defendant NDF Enterprises as a condition of his ownership in the Organic America Collective.

Also in the fall of 2013, Nicholas boasted to Plaintiff that he had purchased a hunting cabin in Michigan for Karo. At the same time, Plaintiff became aware of the serious operating deficits at Amherst Farm and that it was failing. Plaintiff

began using his personal funds to assist with the Farm's operating obligations. Meanwhile, instead of receiving any profits from the Organic America Collective as promised, Nicholas continued to make outlandish expenditures on new homes, furniture, and travel.

In February of 2014, Plaintiff went to Colorado where he visited a 7,000 square foot home allegedly purchased by other Organic America Collective investors for the benefit of Nicholas.  At this time, Plaintiff began to suspect Defendants' claims concerning the viability of Organic America Collective were false.  By March of 2014, Nicholas and Karo had almost completely ceased communicating with Plaintiff.  His requests for information were repeatedly ignored.  On March 28, 2014, Plaintiff sent an email demand to Nicholas seeking the return of his investment in the Organic America Collective.  Receiving no response, Plaintiff followed up on April 4, 2014 with an email to both Nicholas and Karo.  Plaintiff's email indicated that he would be forced to retain counsel if he received no response.

On April 9, 2014, Karo responded to Plaintiff's email by stating that he was not scared of attorneys and that Plaintiff's "disconnection from the Organic America Collective" was caused by Plaintiff, who "cost our business a lot of money through erratic conduct and misconduct."

Over the next few months, Plaintiff became convinced that Karo and

Nicholas used his investments to fund their lavish lifestyles.  Both refused to account for his investments.  After a May 13, 2014, demand for an accounting, Karo responded that he was in the process of putting together an accurate accounting of Plaintiff's involvement with Organic America.  To date, Plaintiff has yet to receive an accounting of how Plaintiff's investment was allocated to the various Organic America Collective entities.

## III.   LAW & ANALYSIS

### A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims.  To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citations and quotations omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Id.* at 1950.

The district court generally reviews only the allegations set forth in the complaint in determining on whether to grant a Rule 12(b)(6) motion to dismiss, however "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account. *Amini v. Oberlin College*, 259 F. 3d 493, 502 (6th Cir. 2001).  Documents attached to a

defendant's "motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.*

## B.     Defendants' Motion to Dismiss

## 1.     RICO claim (Count I)

To state a RICO claim, Plaintiff must plead the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).    An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *800537 Ontario Inc. v. Auto Enterprises, Inc.*, 113 F. Supp.2d 1116, 1121 (E.D. Mich. 2000).   It is "an ongoing structure of persons associated through time, joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making." *Id*. at 1122.  A "certain amount of organizational structure" is required so as to "eliminate[] simple conspiracies from RICO's reach." *Id*. "The hallmark of a RICO enterprise is its ability to exist apart from the pattern of wrongdoing." *Id*. This requirement "avoid[s] the danger of guilt by association that arises because RICO does not require proof of a single agreement as in a conspiracy case . . . ." *Id*.  RICO's aim is "criminal enterprises" rather than "individuals who associate for the commission of sporadic crime." *Id*.

Here, Plaintiff again fails to plead a viable RICO claim.   Plaintiff's

allegations with respect to a RICO enterprise continue to be woefully inadequate. He fails to plead any type of organizational structure that would continue to exist regardless if the individual players came and went. He merely alleges a division of labor between Karo and Nicholas. His allegations fail to apprise the Court or the Defendants how the RICO enterprise exists separate and apart from the Defendants' wrongful conduct.

Additionally, Plaintiff has not sufficiently plead a pattern of racketeering activity. To establish a "pattern of racketeering" in a federal RICO case, Plaintiff must allege that two predicate acts "are related and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). These predicate acts of racketeering may include mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343. "Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it." *Wallace v. MidWest Financial*, 714 F.3d 414, 419 (6th Cir. 2013). Plaintiff fails to identify a single document that was "mailed."

He alleges two wire transfers that occurred in less than a two month period, neither of which was performed by a Defendant. The continuity prong requires either a closed pattern (a series of related predicate acts extending over a substantial period of time) or an open-ended pattern (a set of predicate acts that pose a threat of continuing conduct extending beyond the period in which the

predicate acts are performed). *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14 (1985) (quoting S. Rep. NO. 97-617 at 158 (1969)("two isolated acts of racketeering do not constitute a pattern.")   For these reasons, Plaintiff's RICO claim is dismissed.

### 2.      Fraud Claims (Counts IV-VII)

The elements of Plaintiff's fraud claim include: (1) Defendants made a material misrepresentation; (2) it was false; (3) when Defendants made it, they knew it was false, or made recklessly, without any knowledge of its truth and as a positive assertion; (4) they made it with the intention that it should be acted upon by Plaintiff; (5) Plaintiff acted in reliance upon it; and (6) Plaintiff suffered injury. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 337 (1976). "[A]n action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact." *Id*.   Future promises are contractual and do not constitute fraud." *Id.*   However, a fraudulent misrepresentation claim "may be based upon a promise made in bad faith without intention of performance." *Id*. at 337-38.

Defendants complain that all of Plaintiff's claims based in fraud fail to meet the heightened pleading requirements of Rule 9(b).   Fed. R. Civ. P. 9(b) ("In alleging fraud[,] a party must state with particularity the circumstances constituting fraud or mistake.") "The purpose of Rule 9(b) is to provide fair notice to the

defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999). Rule 9(b) is intended to "protect a defendant's reputation by precluding unfounded allegations of fraud." *Krieger v. Gast*, No. 4:99-cv-86, 2000 U.S. Dist. LEXIS 3097, * 10 (W.D. Mich. Jan. 21, 2000) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).

In the Sixth Circuit, in order to satisfy Rule 9(b)'s requirements, a plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamax L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993). A plaintiff must satisfy Rule 9(b)'s particularity requirement as to each element and each defendant. *Krieger*, 2000 U.S. Dist. LEXIS 3097, at *11 (citing *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1114 (W.D. Mich. 1996).

In its Order requiring Plaintiff to file an Amended Complaint, the Court found that Plaintiff's fraud allegations were "vague and non-specific. He does not identify who made the statements, their content nor the precise means of communication." *See* Dkt. No. 32 at 12. The Court further noted that "Plaintiff fails to articulate the particular fraudulent conduct attributable to each Defendant."

14

2:16-cv-11211-GAD-SDD   Doc # 58   Filed 02/22/17   Pg 15 of 28   Pg ID 1760

*Id.* While Plaintiff's Amended Complaint specifies the Defendant or Defendants whom the claim is alleged against, his fraud allegations still mostly fail to identify which Defendants made representations, on what dates, by what means, and the "particular" contents of those alleged misrepresentations. Am. Compl., ¶ 255 ("The defendants made numerous material representations . . . ."); ¶265 ("The defendants conspired together to make these representations . . . ."); ¶269 ("[D]efendants had a legal duty to timely disclose numerous material facts . . . .").

Plaintiff bases most of his fraud claims on representations made by either Nicholas or Karo regarding the "viability" of the Organic America Collective. However, statements predicting growth and profit and trumpeting the business acumen of a person are nothing more than mere "puffery," which cannot form the basis of a claim for fraud or misrepresentation under Michigan law. *See Miller v. Laidlaw & Co.*, No. 11-12086, 2013 U.S. Dist. LEXIS 44682, (E.D. Mich. Mar. 28, 2013); *Van Tassel v. McDonald Corp.*, 159 Mich. App. 745, 751; 407 N.W.2d 6 (1987). As such, to the extent Plaintiff relies on Nicholas's and Karo's statements that the Organic America Collective was "viable," these statements are not actionable under a fraud theory. Nor are future statements that the Amherst Farm would become a "massive self-sustaining and renewable aquaponic/hydroponic farm" actionable under a fraud theory. *Id.*

The other statements relied on by Plaintiff fail because he does not provide

express dates, means or locations for these statements as required by Rule 9(b). Additionally, many of the statements were made after Plaintiff entered into the subject Agreements and invested money into the businesses.  For instance, Plaintiff complains that Nicholas told him "that he had to be patient before receiving profits."  While Plaintiff fails to provide the requisite Rule 9(b) specifics as to this claim, it appears that it was made well after Plaintiff invested funds into the Organic America Collective.   Plaintiff could not have been induced to invest money in Nicholas's businesses by this statement since he had already invested his money at that time.

As to Defendant Ostendorf and Tom Del Franco, Plaintiff again fails to provide any specifics as to what either did to induce him to invest his money with Nicholas.   He says they "worked collectively" to "create perceptions."   Am. Compl., ¶¶ 138-39.   These vague allegations fall woefully short of Rule 9(b)'s specificity requirements.   Plaintiff's fraud based claims are therefore subject to dismissal pursuant to Rule 12(b)(6).

### 3.      Conversion  (Count II)

Conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391; 486 N.W.2d 600 (1992).  Defendants argue that Plaintiff cannot state a claim for conversion because

the subject transactions were loans advanced by Plaintiff to pay for insurance premiums.  The law in Michigan is well-settled that in order to state a viable claim for conversion, "[t]he defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship."  *Head v. Phillips Camper Sales & Rental, Inc.*, 234 Mich. App. 94, 112 (1999); *Lawsuit Financial v. Curry*, 261 Mich. App. 579 (2004).

Plaintiff claims the Defendants "[o]btained possession of and title to Plaintiff's assets. . . ."  Am. Comp. ¶ 234.  The Amended Complaint identifies two items:  a motor vehicle and a mortgage.  *Id.* at ¶ 237-38.[2]  However, Plaintiff fails to allege that any Defendant took possession of or exercised dominion or control over the motor vehicle.  Rather, he alleges that "Defendants fraudulently informed Plaintiff he would need to turn in his personal vehicle and buy a new "flashy" vehicle for the benefit of the Organic America Collective, and specifically title the new vehicle in NDF Enterprises' name" *Id.* at ¶ 235.  Plaintiff fails to allege anyone other than himself who took possession of the motor vehicle.  *See id*. at ¶ 234-239.  Moreover, Plaintiff's allegation that Defendants somehow converted a mortgage he gave to his mother to secure a loan does not state a conversion claim.  Plaintiff fails to respond to this aspect of Defendants' Motion, therefore Plaintiff

---

[2]  In the original Complaint, the only property that was misappropriated was money.  *See* Comp. ¶ at 157.  It appears that Plaintiff has abandoned this basis for his conversion claim.  In any event, it is well settled in Michigan that an action for conversion of money will not lie unless there is an obligation to return specific money that is unique.  *See Gerras v. Bekiare*, 315 Mich. 141, 148 (1946); *Anderson v. Reeve*, 352 Mich. 65, 70 (1958).

has abandoned this aspect of his conversion claim.

Plaintiff also alleges statutory conversion.  Statutory conversion consists of knowingly "buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property."  MICH. COMP. LAWS § 600.2919a.  Plaintiff has likewise failed to state a statutory conversion claim.  Defendants cannot be liable under MICH. COMP. LAWS § 600.2919a because conversion cannot lie where the Plaintiff lent money and assented to the creation of a creditor/debtor relationship.  Additionally, Plaintiff's allegations with respect to the motor vehicle do not amount to any of the Defendants knowingly "buying, receiving, or aiding in the concealment of any stolen, embezzled or converted property."  Rather, Plaintiff alleges that Defendants Nicholas and Karo required him to trade in his own vehicle for the purchase of a new truck for the benefit of NDF Enterprises.  Plaintiff likewise fails to allege a statutory conversion claim.

### 4.   Tortious Interference (Count XII)

In order to state a claim for intentional interference with contractual relationship, Plaintiff must allege the following elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by defendant; (3) an intentional interference by defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff.  *Badiee v. Brighton Area Sch.*, 265 Mich. App. 343, 365-

66; 695 N.W.2d 521 (2005).

Defendants argue that the Amended Complaint fails to identify any specific third-party customer or contract that suffered as a result of any alleged interference. Plaintiff fails to address this aspect of Defendants' Motion; therefore, Plaintiff has abandoned this claim.  In any event, Plaintiff fails to allege a tortious interference claim.  Plaintiff allegations are conclusory; he asserts that Defendants caused a breach of the subject Agreements by virtue of their positions in the corporations comprising the Organic America Collective.  This is insufficient to state a claim for tortious interference.

### 5.    Fraudulent Conveyance Act (Count XIII)

To establish a claim under Michigan's Fraudulent Transfer Act, Plaintiff must allege four elements: (1) that the defendant is a person under the Act; (2) that it made a conveyance; (3) that it did so with actual intent to hinder, delay, or defraud creditors; and that plaintiffs are creditors under the Act.  *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1452 (W.D. Mich. 1988).

As an initial matter, Plaintiff concedes that he mistakenly identified this claim as brought pursuant to the Fraudulent Conveyance Act, however Michigan repealed this law in 1998.  Rather, Plaintiff meant to bring this claim under the Fraudulent Transfer Act.  Defendant argues that Plaintiff cannot state a claim under the Fraudulent Transfer Act because he is not a creditor.  Defendants also assert

that pursuant to sections 4, 5, and 6 of the Act, a defendant must be rendered insolvent, or be left with unreasonably small capital or intended to incur debts beyond its ability to pay as they mature as result of the fraudulent transfer.

Contrary to Defendant's argument, Plaintiff has stated a claim under the Fraudulent Transfer Act. Plaintiff is a "creditor" under the meaning of the Act, which defines creditor as any "person who has a claim." MICH. COMP. LAWS § 566.31(d). A "claim" is defined as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." MICH. COMP. LAWS § 566.31(c). Moreover, Plaintiff has alleged sufficient facts to infer that the alleged transfers of money left some or all of the corporate Defendants insolvent.

### 6. Breach of Fiduciary Duty (Count III)

Defendants argue that Michigan courts prohibit shareholders from bringing direct claims for breach of fiduciary duty. However, an exception to this rule exists where the individual shows violation of a duty owed directly to him. *Michigan Nat'l Bank v. Mudgett*, 178 Mic 534h. App. 677, 679; 444 N.W.2d 534 (1989). A second exception exists where a stockholder may individually sue corporate directors, officers, or other persons when he has sustained a loss separate and distinct from that of other stockholders generally. *Christner v. Anderson*,

*Nietzke & Co., P.C.* 433 Mich. 1, 9; 444 N.W.2d 779 (1989) (holding that an individual action was warranted where the plaintiff-shareholder's injuries were 'distinct' because he was the only shareholder excluded from distribution of corporate assets).

In the instant case, Plaintiff has alleged that the Defendants have all received distributions while Plaintiff has received no distributions.  Defendants are alleged to have received distributions and purchased residential properties in Colorado and Michigan, as well as used investor funds to support their lavish lifestyles.  As such, his injury is separate and distinct from the other shareholders.  Lastly, Defendants' assertion that the economic loss doctrine bars this claim is misplaced.  Defendants have repeatedly argued that Plaintiff's breach of contract claim is only between Plaintiff and the corporate Defendants Greenhouse Leasing and Organic America Markets, LLC, and not the remaining corporate or individual Defendants.  As such, the "relationship between [these] parties is [not] . . . governed by a contract between them."  Plaintiff has alleged separate legal duties apart from the contracts at issue herein, therefore the economic loss doctrine does not apply.

### 7.    Unjust Enrichment (Count X)

The elements of a claim for unjust enrichment include:  (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant.  *Martin v. East Lansing Sch.*

*Dist.*, 193 Mich. App. 166, 177; 483 N.W.2d 656 (1992).  In such instances, the law operates to imply a contract in order to prevent unjust enrichment.  *Id.* However, a contract will only be implied if there is no express contract governing the same subject matter. *Id.*; *Campbell v. City of Troy*, 42 Mich. App. 534, 537; 202 N.W.2d 547 (1972).

Defendants argue that Plaintiff's unjust enrichment claim fails because express contracts govern this matter.  However, Defendants concede that Plaintiff's theory that he bargained for an eight percent (8%) interest in the Organic America Collective is not part of the express contracts at issue herein.  They further assert that only Greenhouse Leasing, LLC and Organic America Markets, LLC were parties to the agreements with Plaintiff.  Moreover, Plaintiff has alleged that he wired more money than what was agreed upon in the express contracts at issue herein. He further alleges that the money was diverted to the personal account of Nicholas and used to support the lavish lifestyles of the individual Defendants. Because Plaintiff has alleged the individual Defendants received the benefits of funds not included in the express contracts, he has alleged the existence of an implied contract and his unjust enrichment claim withstands Rule 12(b)(6) scrutiny.

### 8.  Equitable Accounting (Count XXV)

Defendants argue that Plaintiff cannot proceed with a claim for equitable

accounting because he has an adequate remedy at law.  However, in *Weiner v. Weiner*, the district court rejected a similar argument as that advanced by the Defendants.  1:06-cv-642, 2008 U.S. Dist. LEXIS 21163 (W.D. Mich. Mar. 18, 2008).

Under Michigan law, "[w]hen a shareholder seeks judicial relief after being denied a request to inspect a corporation's records, a court may, in its discretion, order the corporation to permit the inspection 'and award other or further relief as the court may consider just and proper.'"  2008 U.S. Dist. LEXIS 21163, at *20 (citing MICH. COMP. LAWS § 450.1487(3)).  However, a plaintiff has no right to an accounting if he has an adequate remedy at law.  2008 U.S. Dist. LEXIS 21163, at *21-22.  As such, a plaintiff seeking the equitable remedy of an accounting must show that the "the Defendant has done something improper or that the financial records are too complicated to comprehend through discovery."

Here, Plaintiff has alleged Defendants' improper conduct of funneling his investments in the Organic America Collective for use to support their lavish lifestyles.  Plaintiff has also argued that Defendants have failed to produce any documents in discovery which bear on the financial health or status of the Defendant corporations.  Therefore, the Court finds that dismissal of Plaintiff's equitable accounting claim would be premature at this juncture.  Defendants are not entitled to dismissal of this claim.

### 9.       Minority Shareholder Oppression (Count XIV)

Section 489 of the Michigan Business Corporation Act, MICH. COMP. LAWS §§ 450.1101-2099, provides that a shareholder may bring an action to establish that the acts of the directors or those in control of the corporation are "illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder." MICH. COMP. LAWS § 450.1489(1). Section 489 "creates a statutory cause of action along with flexible discretionary remedies to shareholders of closely held corporations." *Estes v. Idea Eng'g & Fabricating, Inc*., 250 Mich. App. 270, 278; 649 N.W.2d 84 (2002). "[T]his statutory cause of action for 'oppression' in favor of minority shareholders who are abused by 'controlling' persons, is a direct cause of action, not derivative, and though similar to a common-law shareholder equitable action, provides a separate, independent, and statutory basis for a cause of action." *Id.*

Here, Plaintiff has alleged that the Defendants have misused their collective power over the corporations' affairs to enrich themselves at the expense of the corporation and Plaintiff by funneling corporate funds to the Defendants to support their lavish lifestyles. As such, contrary to Defendants' argument, Plaintiff has stated sufficient allegations to put them on notice that Plaintiff is asserting a direct claim on his own behalf, which he has a statutory right to do under Michigan law.

24

### 10.   Conspiracy (Count XI)

"A civil conspiracy is a combination of two or more persons, by some concerted action to accomplish a criminal or unlawful purpose, or to accomplice [sic] a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Casualty Ins. Co.,* 194 Mich. App. 300, 313; 486 N.W.2d 351 (1992). For a claim of civil conspiracy to succeed, "it is necessary to prove a separate, actionable tort." *Early Detection Ctr., P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 632; 403 N.W.2d 830 (1986).  Plaintiff has sufficiently alleged a claim for breach of fiduciary duty.  Should Plaintiff prove his claim for breach of fiduciary duty, he may be able to likewise establish his claim for civil conspiracy against the Defendants.  Dismissal of this claim is premature.

### 11.   New Jersey State Law Claims (Counts XV through XXIV)

In this Court's Order Denying Defendants' Motion to Dismiss Without Prejudice, the Court concluded that Michigan law governed this action.  *See* Dkt. No. 32, Pg ID 1157.  Accordingly, Plaintiff's New Jersey claims are dismissed from this cause of action.

## IV.   CONCLUSION

For the reasons articulated above, the Court will grant in part and deny in part Defendant's Motion to Dismiss the Amended Complaint [#40].

It is further ordered that the Court will dismiss the following counts from the

Amended Complaint:   Count I (Civil Rico), Count II (conversion), Count IV (fraudulent misrepresentation), Count V (silent fraud), Count VI (negligent misrepresentation), Count VII (innocent misrepresentation), Count XII (intentional interference with business relationship), Counts XV through XXIV (New Jersey state law claims).

It is further ordered that the following claims remain: Count III (Breach of Fiduciary Duty), Count VIII (Breach of Contract as to Greenhouse Leasing, LLC), Count IX (Breach of Contract as to Organic America Markets, LLC), Count X (unjust enrichment as to all Defendants), Count XI (Civil Conspiracy), Count XIII (Michigan Fraudulent Transfer Act), Count XIV (minority shareholder oppression), Count XXV (Equitable Accounting).

Miller, Canfield and its attorneys are HEREBY TERMINATED from representation of Defendants.  However, the Court will require counsel to send a copy of the instant order to the individual Defendants (excluding Martin Karo) and to file proof of service on CM/ECF.

It is further ordered that the Court will amend the dates to the scheduling order.  The following dates shall govern this matter:

| Status Conference:[3] | March 14, 2017 at 10:00 a.m. |
|---|---|

---

[3] If the individual Defendants fail to obtain counsel by the date of the Status Conference, they must appear at the conference.  Pursuant to this Court's previous holding, the corporate Defendants must proceed in this action with counsel.  As such, should the corporate Defendants fail to obtain counsel, they will be defaulted.

| | |
|---|---|
| Rule 26 Disclosures: | March 17, 2017 |
| Witness Lists: | May 1, 2017 |
| Facilitation: | May 23, 2017 |
| Discovery Cutoff: | August 21, 2017 |
| Dispositive Motion Cutoff: | September 11, 2017 |
| Settlement Conference with Magistrate Judge Stephanie Dawkins Davis: | December of 2017 |
| Motions *in Limine* due: | December 11, 2017 |
| Final Pretrial Order due: | January 8, 2018 |
| Final Pretrial Conference: | January 15, 2018 at 2:00 p.m. |
| Jury Trial: | January 30, 2018 at 9:00 a.m. |

SO ORDERED.

Dated:  February 22, 2017                              /s/Gershwin A. Drain
                                                              GERSHWIN A. DRAIN
                                                              United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 22, 2017, by electronic and/or ordinary mail.
<u>/s/ Tanya Bankston</u>
Deputy Clerk